**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Laurence J. Hasson
Daniel Sadeh
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email:  bernstein@bernlieb.com
          lhasson@bernlieb.com
          dsadeh@bernlieb.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AH KIT TOO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ROCKWELL MEDICAL, INC., ROBERT L. CHIOINI, and THOMAS E. KLEMA,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ah Kit Too ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and

1

announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rockwell Medical, Inc. ("Rockwell" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased or otherwise acquired the publicly traded securities of Rockwell between March 16, 2018 and June 26, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

4.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased Rockwell securities during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7. Defendant Rockwell operates as an integrated biopharmaceutical company targeting end-stage renal and chronic kidney diseases in the United States and internationally. The Company is incorporated in Michigan and its principal executive offices are located at 30142 Wixom Road, Wixom, Michigan 48393. Rockwell's common shares trade on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "RMTI."

8. Defendant Robert L. Chioini ("Chioini") founded Rockwell and served as its Chief Executive Officer from February 1997 to May 22, 2018 and its President during the Class Period.

9. Defendant Thomas E. Klema ("Klema") served as Vice President of Finance, Chief Financial Officer, Treasurer and Secretary of Rockwell during the Class Period.

10. Defendants Chioini and Klema are sometimes referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

   (a) directly participated in the management of the Company;

   (b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. The Company and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

13. The Company's lead branded drug is Triferic, an iron maintenance therapy that replaces the iron lost by patients during hemodialysis treatment, a dialysis treatment.

14. The Centers for Medicare and Medicaid Services ("CMS") pays providers a bundled reimbursement rate, a single payment per dialysis treatment, and does not reimburse providers for individual drugs (*i.e.*, Triferic) and services provided to patients. Therefore, dialysis drugs like Triferic are viewed by providers as an additional cost rather than as a source of revenue.

15. When implementing the bundled rate, CMS conveyed that they would create a formal pathway for new innovative therapies to receive "separate reimbursement" or "transitional payment" (a separate payment from CMS outside of the bundled payment) for a 2-year period so that: (a) dialysis providers would have incentive to make those therapies

available to patients; (b) patients would not be denied access to new therapies and improved clinical outcomes; and (c) innovation in the renal market would not be stifled. During the Class Period, the Company was seeking "separate reimbursement status" for Triferic from the CMS.

16.     In the absence of separate reimbursement approval for Triferic, dialysis service providers are likely to adopt Triferic at a much slower rate than if Triferic is granted such status, due to the cost of conversion and lack of an immediate financial incentive to adopt Triferic.

17.     If Triferic is not approved for "separate reimbursement status" by the CMS, Rockwell will not be able to commercialize the drug successfully, and will have to write off some, or all, of its Triferic inventory. Accordingly, obtaining "separate reimbursement status" or "transitional payment" for Triferis is material to Rockwell's business, operations, and financial position.

**Materially False and Misleading Statements and/or Omissions**

18.     On March 15, 2018, during aftermarket hours, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2017. The 2017 10-K was signed by Defendants Chioini and Klema, with Defendant Chioini signing on behalf of Rockwell. The 2017 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Chioini and Klema attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19. The 2017 10-K discussed Rockwell's pursuit of separate reimbursement for Triferic, and stated that "we anticipate that Triferic will receive separate reimbursement," stating in pertinent part:

> *Separate Reimbursement.* While we cannot predict the outcome or timing of the CMS review, ***we anticipate that Triferic will receive separate reimbursement*** as a result of our extensive efforts in working with policy makers, Congress and stakeholders within the dialysis industry. We have had in-depth discussions with senior officials within the current administration, key members of Congress, patient advocacy groups and other industry stakeholders regarding the merits of Triferic and why this innovative therapy should receive separate reimbursement. Our efforts have received strong support. We have submitted information to CMS that highlights the improved clinical benefits that Triferic provides to patients, as well as the significant cost savings Triferic delivers to both Medicare and dialysis providers.
>
> \*   \*   \*
>
> ***We believe Triferic is a new innovative therapy, and we are seeking separate reimbursement for Triferic.***
>
> \*   \*   \*
>
> We have built significant inventory of Triferic in anticipation of receiving separate reimbursement status. However, if we are unable to successfully commercialize Triferic and achieve sufficient sales volumes over the next one to two years, we may have to write off a significant portion of our inventory investment in Triferic, which would have an adverse effect on our business, results of operations and financial position. We have classified $6.0 million of Triferic Active Pharmaceutical Ingredient ("API") as non-current inventory as of December 31, 2017. We have produced sufficient supplies of Triferic API to meet expected prospective demand in 2018 and 2019, assuming we can start commercial sales under separate reimbursement status in the first half of 2018. As of December 31, 2017, we also had $5.0 million of Triferic finished goods inventory that could expire within the next twelve months and against which we have reserved $3.5 million and expensed in 2017 as a result of the uncertainty regarding separate reimbursement for Triferic. If CMS does not award separate reimbursement for Triferic or further extends its review of Triferic for separate reimbursement, some or all of our current investment in Triferic finished goods inventory could be written off which would have an adverse impact on our results of operations.
>
> \*   \*   \*

> If we are delayed in receiving separate reimbursement for Triferic or if we do not receive separate reimbursement for Triferic, we may need to write-off some or all of our investment in Triferic finished goods inventory which would have a negative impact on our reported results of operations during 2018.

[Emphasis added].

20. On May 10, 2018, the Company filed a Form 10-Q for the quarter ended March 31, 2018 (the "1Q 2018 10-Q") with the SEC, which provided the Company's first quarter 2018 financial results and position. The 1Q 2018 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2018, and that "[t]here have been no changes in our internal control over financial reporting (as defined in Rule 13a-15 under the Exchange Act) during the most recently completed fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The 1Q 2018 10-Q was signed by Defendants Chioini and Klema. The 1Q 2018 10-Q contained signed SOX certifications by Defendants Chioini and Klema attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

21. The 1Q 2018 10-Q discussed Rockwell's pursuit of separate reimbursement for Triferic, stating in pertinent part:

> Although we cannot be certain, ***we believe that Triferic has the potential to be granted separate reimbursement by CMS*** as a result of our extensive efforts in working with policy makers to secure separate reimbursement. We have had in-depth discussions with high level officials within the current administration, key members of Congress, patient advocacy groups and industry stakeholders regarding the merits of Triferic and about why this innovative therapy should receive separate reimbursement. Our efforts have resulted in strong support for separate reimbursement for Triferic. ***We have submitted information to CMS that highlights the improved clinical benefits that Triferic provides to patients, as well as the significant cost savings Triferic delivers to both Medicare and dialysis providers. We cannot predict the outcome or timing of CMS's process and there can be no assurance of if or when we might receive separate reimbursement for Triferic from CMS.***

7

\* \* \*

> If CMS does not award us separate reimbursement for Triferic during 2018 or further extends its review of Triferic for separate reimbursement or should we not realize commercial sales during 2018 or 2019, some or all of our current investment in Triferic finished goods inventory and some of our Triferic API inventory will likely need to be written off, which would not have a material negative impact on our cash flow but would have a material adverse impact on our reported results of operations and financial position.

[Emphasis added].

22. The 1Q 2018 10-Q also noted that the Company "received a letter dated April 24, 2018 from the Securities and Exchange Commission requesting certain information generally with respect to the status of CMS's determination of separate reimbursement status for Triferic and our current decision not to actively market and sell Triferic without such separate reimbursement."

23. The statements referenced in ¶¶18-22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Rockwell was aware that the CMS will not pursue Rockwell's proposal for separate reimbursement for Triferic; (2) the estimated reserves in the Q1 2018 10-Q are misstated; (3) there was a material weakness in Rockwell's internal controls over financial reporting; (4) consequently, Rockwell's internal controls over financial reporting were ineffective during the Class Period; (5) Defendant Chioini withheld material information regarding Triferic from Rockwell's auditor, corporate counsel and five independent directors of the Board; and (6) as a result, Defendants' statements about the

8

Company's business, operations and prospects were materially false and misleading and/or lacked reasonable bases at all relevant times.

## THE TRUTH EMERGES

24.     On May 10, 2018, the Company filed its 1Q 2018 10-Q and revealed that the Company "received a letter dated April 24, 2018 from the Securities and Exchange Commission requesting certain information generally with respect to the status of CMS's determination of separate reimbursement status for Triferic and our current decision not to actively market and sell Triferic without such separate reimbursement."

25.     On May 22, 2018, during aftermarket hours, Rockwell announced that Defendant Robert Chioini, Rockwell's President and Chief Executive Officer, had been terminated effective immediately.

26.     On May 23, 2018, NASDAQ announced that "trading in the company's stock had been halted today, May 23, 2018, at 09:23:14 Eastern Time for 'news pending' at a last sale price of $5.94."

27.     On May 23, 2018, at 11:26 a.m. Eastern Time, Defendant Chioini issued a press release entitled, "Rockwell Medical CEO Issues Press Release," which contained a letter to shareholders explaining the circumstances surrounding his termination, stating in pertinent part:

**Rockwell Medical CEO Issues Press Release**

*May 23, 2018 11:26 ET* | **Source:** Rockwell Medical, Inc.

WIXOM, Mich., May 23, 2018 (GLOBE NEWSWIRE) -- Rockwell Medical, Inc. (NASDAQ:**RMTI**), a fully-integrated specialty pharmaceutical company targeting end-stage renal disease (ESRD) and chronic kidney disease (CKD) with innovative products and services for the treatment of iron replacement, secondary hyperparathyroidism and hemodialysis, issued a letter to shareholders on behalf of Rob Chioini, President and Chief Executive Officer.

9

> *I submitted a response to The 8K that the Company issued this morning May 23, 2018, that I signed, Acc-no: 0001104659-18-035192, is true and accurate and represents correctly what has transpired. We have made appropriate disclosures to the Company's auditors, and we are following proper governance measures. As CEO, I have instructed the CFO to remain in his duties.*
>
> *As the 8K states, on May 22, 2018, I called an emergency Board meeting for the purpose of discussing a shareholder demand letter requesting an independent investigation and alleging breaches of fiduciary duties and other possible violations of securities and other laws by various directors. The special meeting was called for the sole purpose of discussing various allegations of misconduct by directors and inform the full Board of steps the non-conflicted independent directors have taken to retain counsel and initiate an independent investigation. The call was convened and the directors whose conduct was the subject of the allegations of breaches of fiduciary duties, with securities counsel present, asserted the position that they voted to fire the CEO. As that action was not the purpose of the special meeting, the termination of the CEO, in the opinion of the non-conflicted independent directors, was not effective. The CEO, through counsel, has notified the SEC of the action taken by the directors whose conduct is discussed in the demand letter that gave rise to the investigation. The CEO continues to serve as the CEO consistent with the terms of his employment agreement. The internal investigation is proceeding under direction of the two non-conflicted independent directors Patrick Bagley and Ronald Boyd who have retained qualified and highly experienced counsel to conduct the investigation.*
>
> *The Chairman of Board issued a second conflicting 8K this morning. Therein is referenced a Board meeting in which it is asserted that the CFO, Thomas Klema, was terminated. I have no information to suggest the governance requirements to call such a meeting were followed. The same 8K states that the Board created a Special Transition Committee comprised of Benjamin Wolin, Lisa Colleran, and John Cooper, to provide board-level oversight of the Company's strategic direction and day-to-day operations during the Company's transition. I have no information to suggest that the governance requirements for the creation of such a committee were followed.*
>
> *I am informed that the independent investigation has commenced. Our expectation is that all directors will cooperate fully with the investigation. I remain committed fully to acting in the best interests of all shareholders.*

28.     On this news, upon resumption of trading on May 25, 2018, shares of Rockwell fell $0.37 per share, or over 6%, over two consecutive trading days to close at $5.57 per share on May 29, 2018, damaging investors.

10

29. On June 27, 2018, during pre-market hours, Rockwell filed a Form 8-K with the SEC revealing the resignation of its auditor, Plante & Moran, PLLC (the "auditor"), effective immediately. Exhibit 99.2 attached to the Form 8-K contained a letter from the auditor to Rockwell, dated June 22, 2018 (the "letter"). The Form 8-K incorporated the letter by reference.

30. The letter attached an e-mail, dated March 27, 2018, from the CMS to Rockwell, regarding Rockwell's pursuit of separate reimbursement status for Triferic. In that e-mail, CMS stated that it reviewed the Company's proposal for separate reimbursement status, and "[u]nfortunately, given the other initiatives CMS has underway, we will not be able to pursue this model." According to the auditor, "this e-mail and its contents are inconsistent with representations made to us by Rockwell, orally and in writing." The auditor's letter stated that due to the e-mail from the CMS, the estimated reserves in the Q1 2018 10-Q are misstated and have not been corrected, there was a material weakness in Rockwell's internal controls over financial reporting, Defendants Chioini's and Klema's SOX certifications attached to the Q1 2018 10-Q are "inconsistent with the facts in existence at the time of filing," and statements within the Q1 2018 10-Q "regarding the status of Rockwell's request for separate reimbursement with CMS and the prospects for reversal of CMS's decisions," "should be clearer and more transparent."

31. On this news, shares of Rockwell fell $0.85 per share, or over 16%, over two consecutive trading days to close at $4.41 per share on June 28, 2018, damaging investors.

32. On June 29, 2018, Rockwell issued a press release entitled, "Rockwell Medical Provides Investor Update," stating that "it appears that Chioini and perhaps others withheld information regarding Triferic from the Company's auditor, corporate counsel and five independent directors of the Board," stating in pertinent part:

**Rockwell Medical Provides Investor Update**

NEWS PROVIDED BY
**Rockwell Medical, Inc.**
Jun 29, 2018, 07:28 ET

WIXOM, Mich., June 29, 2018 /PRNewswire/ -- Rockwell Medical, Inc. (NASDAQ: RMTI) ("the Company") today provided an update to its investors.

Ben Wolin, Chairman of the Board, said, "Five independent directors of the Board have been working tirelessly to protect shareholders' interests and move the Company forward, including continuing its search to identify a new CEO and CFO and now to secure a new auditor. Despite the continued interference and obstruction by terminated CEO Rob Chioini, terminated CFO Thomas Klema, current board member Ron Boyd, and former board member Patrick Bagley, all of us at Rockwell Medical are intently focused on bringing our life-saving treatment, Triferic, to market and are optimistic about the Company's future."

On June 20, following two days of court-ordered mediation and negotiation, the Company, Chioini, Klema, Boyd and Bagley all signed a binding term sheet that, among other things: fully empowered the Board to act in the best interest of shareholders; prevented Chioini and Klema from holding themselves out as officers or representatives of the Company, interfering with the Company, or acting directly or indirectly on behalf of the Company; allowed the Company to continue its process to hire a CEO and CFO after July 11; and obligated Bagley to resign from the Board immediately.

**On June 22, Plante & Moran, PLLC resigned as auditor for the Company. Plante Moran's resignation letter highlighted several areas of concern based upon its view that former management did not make them aware of an email received from CMS's Center for Medicare and Medicaid Innovation on March 27 (the "CMMI Email") regarding Rockwell Medical's pursuit of Triferic special reimbursement status. The Company will be investigating the circumstances around the CMMI Email and has begun work on identifying and seeking to retain a new audit firm.**

Mr. Wolin added, "**Unfortunately, Chioini, Klema and Boyd continue to engage in behavior to the detriment of the Company and all its stakeholders, including shareholders, patients, clinicians and employees. Among other misconduct, it appears that Chioini and perhaps others withheld information regarding Triferic from the Company's auditor, corporate counsel and five independent directors of the Board.** In light of their ongoing wrongful behavior, including their attempts to regain control of Rockwell Medical at the expense of

12

shareholders, we will continue to explore every avenue possible to defend the Company from these actions."

[Emphasis added].

33. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Rockwell during the Class Period and who were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

37. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a. whether Defendants' acts as alleged herein violated the federal securities laws;

   b. whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

   c. whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

   d. whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

   e. whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

   f. whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

   g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

40. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants' made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. the Company's securities are traded in efficient markets;

d. the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on NASDAQ, and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g. Plaintiff and members of the Class purchased the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h. unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

41. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. This Count is asserted against the Company and the Individual Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

47. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would

be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Company and the Individual Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

48. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

49. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated, as a result of the Company's and the Individual Defendants' false and misleading statements.

50. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information

which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

51. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

52. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act

### Against The Individual Defendants

53. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

55. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which were materially false or misleading.

56. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

57. The Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

58. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and postjudgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 27, 2018                                Respectfully Submitted,

**BERNSTEIN LIEBHARD LLP**

/s/ Daniel Sadeh
Stanley D. Bernstein
Laurence J. Hasson
Daniel Sadeh
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email:  bernstein@bernlieb.com
          lhasson@bernlieb.com
          dsadeh@bernlieb.com

*Counsel for Plaintiff*